## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**RALPH B. SMITH,**

      **Petitioner,**

   **v.**                    **Case No. C-2-03-580**
                                        **JUDGE FROST**
**PAT HURLEY, Warden,**           **Magistrate Judge KING**

      **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the instant petition, respondent's return of writ, and the exhibits of the parties.

## I. FACTS

This case involves the following facts, as summarized by the Fifth District Court of Appeals:

> On February 2, 2000, two armed intruders entered the home of Rudy and Trisha Stefanitsis. (T. at 391). The men were armed with guns and a butcher knife. (T. at 433, 495).
>
> While Mr. And Mrs. Stefanitsis testified that both of the intruders wore face masks (T. at 397-398), they also testified that the mask of one of the perpetrators fell down several times allowing them to see his entire face. (T. 398-399, 499).
>
> The intruders forced Mr. Stefanitsis to open his safe, from which they stole cash and comic books. (T. at 404). They also ordered Mrs. Stefanitsis to give them her wedding ring, her watch, two necklaces and two bracelets which she was wearing at the time. (T. at 405, 411, 492). The intruders also stole a bracelet which was being worn by Mr. Stefanitsis (T. at 415), $300 to $400 in cash from his wallet which was laying on a dresser (T. at 419-420), as well as a necklace

removed from upstairs in the house. (T. at 415). They also took the cordless telephone. (T. at 419).

Prior to fleeing, the intruders cut the telephone lines (T. at 419) and tied up Mr. and Mrs. Stefanitsis with electrical tape. (T. at 423-424).

The Stefanitsis' three young children were also present during these events.

Upon trying to determine who might know that they possessed a safe in their house, the name of Ralph Blaine Smith was suggested to Mr. Stefanitsis. (T. at 433). A photo array was assembled by Detective Silvernail which included a photo of Ralph Blaine Smith. (T. at 434). Both Mr. and Mrs. Stefanitsis separately and independently picked Appellant out of the photo array. (T. at 12-15, 434). Mr. Stefanitsis testified that he had never seen a photograph of Ralph Blaine Smith prior to viewing the photo array. (T. at 436). Testimony was also received that Mrs. Stefanitsis had never seen a picture of Appellant prior to the presentation of the photo array. (T. at 78, 110).

Exhibit 11 to Return of Writ.

## II. PROCEDURAL HISTORY

Petitioner was indicted by the 2000 term of the Fairfield County grand jury on two counts of aggravated burglary, in violation of O.R.C. §2911.11(A)(1), three counts of aggravated robbery, in violation of O.R.C. §2911.01(A)(1), two counts of kidnapping, in violation of O.R.C. §2941.145, and theft, in violation of O.R.C. §2913.02, with specifications. Exhibit 1 to Return of Writ. While represented by counsel, petitioner proceeded to jury trial, and on August 10, 2000, was found guilty, as charged, except that he was found guilty of fifth degree felony theft, not fourth degree felony theft. Exhibit 5 to Return of Writ. On September 12, 2000, petitioner was sentenced to an aggregate term of 61 years incarceration plus six years for use of a firearm. Exhibit 6 to Return of Writ. Represented by new counsel, petitioner filed a timely appeal of his convictions to the Fifth District Court of Appeals. Exhibits 7 and 8 to Return of Writ. He asserted the following assignments of error:

1. The trial court erred in failing to grant defendant's motion to suppress the identifications of the state's witnesses where the identifications were inherently unreliable and were tainted by improper law enforcement procedures.

2. The identifications of the defendant, Ralph Blaine Smith, at trial were not of independent origin, but were tainted by the prior improper out of court identifications that must be excluded from a fair trial as guaranteed through the Sixth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 10 of the Ohio Constitution.

3. The trial court erred in imposing upon Ralph Blaine Smith, the defendant-appellant, maximum consecutive sentences in violation of his right to effective assistance of counsel as guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10, of the Ohio Constitution.

4. The trial court erred prejudicially by imposing upon the defendant-appellant multiple sentences for multiple aggravated robbery offenses arising out of a single incident which, for sentencing purposes, merged as allied offenses of similar import.

5. The trial court committed reversible error by ordering the defendant-appellant to pay restitution in the amount of ten thousand dollars ($10,000.00) or any amount of the alleged victims' speculative losses.

6. Appellant was denied the effective assistance of counsel as guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

Exhibit 8 to Return of Writ. On December 10, 2001, the appellate court affirmed the judgment of the trial court. Exhibit 11 to Return of Writ. Represented by new counsel, petitioner filed a timely appeal of the appellate court's decision to the Ohio Supreme Court. He asserted the following propositions of law:

1. It is ineffective assistance of counsel for either trial or appellate counsel to fail to object to or challenge a trial court's practice of permitting jurors to question witnesses at trial.

> 2. A trial court errs in failing to grant a motion to suppress a pretrial identification where the identification process was inherently unreliable and tainted by improper law enforcement procedures.

Exhibits 12 and 13 to Return of Writ. On April 3, 2002, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question. Exhibit 15 to Return of Writ. Still represented by counsel, on March 15, 2002, petitioner also filed an application for reopening of the appeal pursuant to Ohio Appellate Rule 26(B). He asserted the following claim:

> It is ineffective assistance of counsel for either trial or appellate counsel to fail to object or to challenge a trial court's practice of permitting jurors to question witnesses at trial.

Exhibit 17 to Return of Writ. On April 22, 2002, the appellate court denied petitioner's application. Exhibits 18 and 19 to Return of Writ. Petitioner filed a timely appeal of the appellate court's decision to the Ohio Supreme Court, in which he asserted the same proposition of law, Exhibits 20 and 21 to Return of Writ; however, on September 25, 2002, the Ohio Supreme Court declined jurisdiction to hear the case and dismissed the appeal as not involving any substantial constitutional question. Exhibit 23 to Return of Writ.

Represented by counsel, on June 27, 2003, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following:

> The trial court denied Mr. Smith's rights to Due Process and a fair trial by overruling his motion to suppress; the identification testimony resulted from an unfairly suggestive identification process.
>
> Rudolph and Theresa Stefanitsis alleged that, on the evening of February 2, 2000, they and their three children were the victims of a violent home invasion. Two men entered their home brandishing handguns and demanding entry into a safe. The men took an

undetermined amount of cash and collectible comic books from the safe. They also took jewelry from the Stefanitsises. The incident lasted for approximately twelve to fifteen minutes.

The jury convicted Mr. Smith solely based on the Stefanitsises' identification of him as one of the robbers. The state presented no physical evidence to connect Mr. Smith with the offense. The state provided no fingerprints, footprints, voice identification, clothing fibers, hair, or other evidence to show that Mr. Smith was in the house. Although the robbers tied the alleged victims with electrical tape, this tape provided no evidence to prove or suggest Mr. Smith's involvement. It was the identification testimony that resulted in Mr. Smith's conviction; yet, this testimony was inconsistent, equivocal at times, and resulted from an improperly suggestive process.

The Stefanitsises' ability to accurately perceive and recall the events that night was impaired by the circumstances of the offense. At the time the Stefanitsises observed the robbers, they were under extreme emotional and physical stress in a dark basement with guns pointed at them. Mr. Stefanitsis in particular had a gun held to his head during most of the incident. He stated that he was trying to calm his screaming wife and children down during the incident. He was so nervous that he had trouble using the combination to open the safe. The limited view he and his wife had of the robbers was further distracted by the emotional state of their screaming children. The robbers wore masks. Although one of the robbers' mask slid down his face three to five times, this resulted only in a brief, partial view. The lighting in the basement was not bright.

Theresa Stefanitsis' testimony is representative of the difficulties with the identification evidence. She specifically stated that her attention was focused on her screaming, frightened children. Although the robber's mask slipped down occasionally, she was unable to see his lips and could not recall whether he had a mustache or goatee. She could not recall the color of this robber's mask or shoes. The day following the incident, she tried to draft a composite sketch, but could not successfully do so. Detective Silvernail, the investigating officer, characterized her description of the robber as vague.

Rudolph's description of the robbers conflicted with Theresa's. They agreed only that the robber whose mask slipped down occasionally was an African-American male who resembled the actor, Omar Epps. However, the round, pudgy Omar Epps bears no resemblence to Mr. Smith, who is tall and lean.

When the Stefanitsises reported the incident to the police, Detective David Silvernail was assigned to investigate the case. He asked them who knew about the safe in their basement. The Stefanitsises provided a list. Mr. Smith's name was not on the list.

Although it is not apparent from the record why Mr. Smith's name became part of this investigation, Rudolph's brother, Larry, mentioned his name in conversation one day. According to Larry, Rudolph knew and saw Mr. Smith on a previous occasion. The Stefanitsises began to investigate Mr. Smith themselves.

On February 9, 2000, Rudolph Stefanitsis gave Mr. Smith's name to the police as a possible suspect. The record indicates that Detective Silvernail did not investigate any of the persons who knew about the safe in their basement. Although the Stefanitsises told Detective Silvernail that two men were responsible for the incident, the record shows no attempt to find the accomplice.

On February 10, 2000, Detective Silvernail asked the Stefanitsises to look at a photo array of six possible suspects. At this time, Detective Silvernail "probably" told the Stefanitsises that Smith's photo would be in the photo array they were about to see. According to Silvernail, the Stefanitsises knew Mr. Smith's picture would be in the array. Silvernail did not select the pictures in the photo array based on the description given by the Stefanitsises the day after the incident. Rather, Silvernail selected them based on Mr. Smith's appearance. In fact, the photo of Mr. Smith showed him with a beard, mustache, and curly hair, traits neither witness gave in their descriptions to the police. When the Stefanitsises saw the photos, they identified Smith's picture as one of the robbers.

While Smith awaited trial, he requested a line-up, which Detective Silvernail refused. He also expressed his willingness to take a lie detector test. After the witnesses identified Mr. Smith, Silvernail did not obtain a search warrant for Mr. Smith's dwelling to look for evidence proving his guilt or innocence. The state did not produce any witnesses who saw Smith with jewelry or a large amount of cash after the incident.

On March 19, 2000, at a grand jury proceeding, Rudolph asked Silvernail to show him a picture of Mr. Smith. He said he wanted to be certain of his identification. This time, Silvernail showed Rudolph a single photo Smith [sic] that included his name. He also showed that photo to Theresa Stefanitsis. Not surprisingly, the Stefanitsiises again identified Mr. Smith. Silvernail testified that Theresa was surer

of her identification *after* seeing this picture than she was before seeing it. When asked about displaying this photo of Mr. Smith, Silvernail admitted that it was "improper" and a "judgment error." He recognized too late that showing a single photo, particularly one with the suspect's name on it, to a victim could prejudice the victim against that one person.

On June 19, 2000, the court conducted a suppression hearing. At this hearing, the Stefanitsises identified Mr. Smith again. At Smith's trial, the Stefanitsises identified Mr. Smith as the "African-American fellow" who was "at the last hearing." That is, the witnesses identified Mr. Smith in court only after seeing two photos of Mr. Smith, one with his name on it, and seeing him in person at the suppression hearing.

It is the position of the respondent that this claim is without merit.

### III. MERITS

Petitioner asserts that he was denied a fair trial when the trial court denied his motion to suppress the in-court identifications of petitioner as one of the masked gunmen as based upon an unduly suggestive out-of-court identification procedure. The state appellate court made the following findings regarding this claim:

Appellant argues that the photo array identifications were inherently unreliable and were tainted by improper law enforcement procedures and that same should have been suppressed by the trial court. We disagree.

There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. *See: State v. Fanning* (1982), 1 Ohio St.3d 19; *State v. Klein* (1991), 73 Ohio App.3d 486, *State v. Guysinger* (1993), 86 Ohio App.3d 592. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *See: State v. Williams* (1993), 86 Ohio App.3d 37. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may

argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry* (1994), 95 Ohio App.3d 93, 96, *State v. Claytor* (1993), 85 Ohio App.3d 623, 627, 620 N.E.2d 906, 908, and *State v. Guysinger* (1993), 86 Ohio App.3d 592. As the United States Supreme Court held in *Ornelas v. U.S.* (1996), 116 S.Ct. 1657, "... as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal."

In the matter presently before us, we find appellant challenges the trial court's decision concerning the ultimate issue raised in his motion to suppress. Thus, in analyzing this Assignment of Error, we must independently determine whether the facts meet the appropriate legal standard.

At the trial in this matter, Detective Silvernail testified that, after the robbery of the Stefanitsis residence, he created a photo array using six numbered photographs. In addition to appellant's photograph, the array contained photographs of five other black males with similar characteristics to appellant. Both Rudy and Trisha Stefanitsis separately picked appellant's photograph out of the array. Appellant maintains that the only reason his photograph was included in the array was because his name was provided to Det. Silvernail by the Stefanitsises and therefore they were expecting the perpetrator's picture to be in said array and that, therefore, the photo array was impermissibly suggestive.

"Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for further reason that the increased chance of misidentification is gratuitous." *Neil v. Biggers* (1972), 409 U.S. 188, 198. "The admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." *Manson v. Brathwaite* (1977), 432 U.S. 98, 106. "[R]eliability is the linchpin in determining the admissibility" of such evidence. *Id.* at 114.

The central question is whether, under the totality of the circumstances, the identification was reliable even if the confrontation procedure was suggestive. *Neil v. Biggers, supra* at

199. The factors to be considered in evaluating the likelihood of misidentification include the following:

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Id.* at 199-200.

Applying the *Biggers'* factors, we find no evidence that the trial court should have suppressed the identifications since we find that the separate out-of-court identifications of appellant by both Rudy Stefanitsis and Trisha Stefanitsis were reliable and, therefore, admissible. At trial, each testified that they had an opportunity to look at appellant's face each time his mask slipped from his face. (Motion to Suppress T. at 9, 51, 84-86, 93, 97, 102- 103).

Both Mr. and Mrs. Stefanitsis demonstrated a high level of certainty in identifying appellant out of the photo array, testifying that their identification of appellant was based solely on what they recalled from the day of the robbery. (Motion to Suppress T. at 53, 57, 62, 90, 93, 97). Finally, there was not an extended length of time between the crime, which was committed on February 2, 2000, and the identification of appellant via the photo array on February 10, 2000.

Under the totality of the circumstances, we find that both Rudy and Trisha Stefanitsis' out-of-court identification of appellant's photograph in the array was reliable. The trial court, therefore, did not commit an error of law when it denied appellant's motion to suppress in this regard. Appellant's First Assignment of Error is overruled.

In his second assignment of error, appellant argues that the identification of appellant at trial was tainted by the prior improper out-of-court identifications. We disagree.

Having found in the first assignment of error that the prior out of court identification of appellant was not improper, we find appellant's second assignment of error not well-taken and overrule same.

Exhibit 11 to Return of Writ.[1]

_____

[1] The trial court made the following findings regarding petitioner's claim:

The factual findings of the state courts are entitled to a presumption of correctness pursuant

to 28 U.S.C. §2254(e):

> (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, the Ohio Court of Appeals' decision is binding on this Court unless it is contrary to clearly

established federal law or was based on an unreasonable determination of the facts based of record:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).  Upon review of the record, the Court concludes that petitioner has failed to

establish that the state court's findings are so unreasonable as to justify federal habeas corpus relief.

*See Williams v. Taylor*, 529 U.S. 420 (2000).

------------------------------------------------------------

1. The photo array selected by Detective Silvernail was not unfair.

2. The identification procedure used in this case did not violate any of the due process rights of the Defendant.

3. There was no suggestion on the part of the State to the witnesses as they were identifying the Defendant.

Exhibit 4 to Return of Writ.

Identification testimony based upon a pre-trial procedure that is so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" violates a criminal defendant's right to due process. *Thigpen v. Cory*, 804 F.2d 893, 895 (6ᵗʰ Cir. 1986), quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see also Stovall v. Denno*, 388 U.S. 293 (1967). "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). The Court first must determine whether the pre-trial identification procedure employed was unduly suggestive. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070-71 (6th Cir. 1994). If so, the Court must then consider the totality of the circumstances in order to determine if the identification is nevertheless reliable. *Id.*, at 1070, citing *United States v. Hill*, 967 F.2d 226, 230 (6th Cir.); *Neil v. Biggers, supra*, 409 U.S. at 199-200; *Thigpen v. Cory, supra*, 804 F.2d at 895. In making this determination, the Court must consider the following five factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the defendant; and (5) the length of time between the crime and the confrontation.

*Ledbetter v. Edwards, supra*, 35 F.3d at 1070, citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Neil v. Biggers, supra*, 409 U.S. at 199-200. Contrary to petitioner's allegations, the record fails to reflect that the pre-trial identification procedure in this case was unduly suggestive.

When first interviewed by police, both Rudy and Trisha Stefanitsis were certain that they could identify one of the robbers who had entered their home.[2] *Trial Transcript,* at 279; 499. Rudy

---

[2] One of the gunmen remained masked during the entire incident, and neither Rudy nor Trisha Stefanitsis said that they could identify that individual.

Stefanitsis later gave Detective David Silvernail petitioner's name as a possible suspect, and

Silvernail therefore created a computer-generated photo line-up which contained petitioner's

photograph along with that of five other African American men with similar features.[3]*Trial*

---

[3] Petitioner asserts that "[t]he Stefanitsises began to investigate Mr. Smith themselves."
*See Petition.* The record indicates as follows:

> Q. When you got the name of Ralph Smith, did you try to find out who he was
> before or some time after you gave the name to the detective?
>
> [RUDY]: I tried to find out from people that I knew, right.
>
> Q. Did anybody describe Ralph Smith to you?
>
> A. Not at all.
>
> Q. Nobody – you tried to find out who he was and you couldn't?
>
> A. They just always said, "I don't know who you're talking about." .... And then
> all of a sudden it was Blaine. Then people knew Blaine.
>
> Q. Okay. Did you try to get a description of Blaine?
>
> A. I mean, people would tell me, you know, "Oh, yeah, I know Blaine. I know
> Blaine." That's all they'd say.
>
> Q. Did you ask what he looked like?
>
> A. I just asked them, you know – yeah, I believe I asked them what he looked
> like.
>
> Q. And did they describe Blaine to you?
>
> A. They just said, you know, Blaine Smith.
>
> Q. They never gave you a description even if you asked?
>
> A. I don't believe so. I don't remember, to be honest.

*Hearing on Motion to Suppress*, at 77.

*Transcript*, at 302. Nothing in the record demonstrates that the photo line-up was improper or impermissibly suggestive.[4] Silvernail made no suggestive remarks or gestures to Rudy or Trisha Stefanitsis prior to or during the identification nor did the Stefanitsises communicate to each other prior to their individual identifications of petitioner as one of the masked gunmen. As noted by the state appellate court, the Stefanitsises viewed the photo line-up and made their identifications separately from one another. *Transcript, Hearing on Motion to Suppress*, at 10. Silvernail told Rudy

> [t]o think about the night of February the 2nd and try to remember the individuals that entered the home.

*Trial Transcript*, at 304. He instructed Trisha in similar fashion. *Hearing on Motion to Suppress*, at 12. Rudy immediately identified petitioner as the perpetrator. *Trial Transcript,* at 304. Rudy was 100 percent certain of his identification. *Id*., at 306. Trisha Stefanitsis viewed the photographs wearing paper hats, similar to the gunman's, prior to making her identification. *Id*., at 307. Trisha identified petitioner as the perpetrator. *Id*., at 308.

> [Prosecutor]: Did you communicate to Trish that Rudy had selected someone?
>
> A. I don't believe I did. I may have. I don't believe so, but I may have.
>
> Q. Do you recall what you said?
>
> A. The only thing at that time is that I'd like her to think about the events that took place on the 2nd, think about who had been in the home, at which time I had turned the photo array over and asked her to look at it. She was unable to make an immediate identification. She asked for the toboggan caps.

---

[4] Unfortunately, the photo line-up is not a part of the record before this Court.

13

*Id.*, at 309. On March 17, 2000, during grand jury proceedings, Silvernail showed Rudy and Trisha

petitioner's photograph because Rudy wanted to see petitioner in person. *Id.*, at 310.

> Q. Then you went to Grand Jury, right?
>
> [RUDY]: Here, yeah.
>
> Q. Yeah, March 17th. And you asked to see Blaine Smith again; is
> that correct?
>
> A. Right.
>
> Q. Were you uncertain? Is that why —
>
> A. It's not that I was uncertain. I wanted to make sure that – I mean,
> I would have liked to see him in person. I would have liked to see
> him like I am right now. I wanted to make sure that the person that
> entered my home is the person that I'm going to court for....

*Transcript, Hearing on Motion to Suppress*, at 79. After viewing petitioner's individual

photograph, both Rudy and Trisha were more certain of their identification. *Id.*, at 311; 441-444;

507-506. Silvernail said that the Stefanitsises knew that petitioner's picture was contained in the

photographic line-up. *Id.*, at 360. However, there is no indication that the Stefanitsises knew what

petitioner looked like prior to the robbery:

> Q. Were you aware whether or not the Defendant was a person that
> the Stefanitsises claimed to know?
>
> A. They stated they had heard the name through their brother, Larry;
> however, they did not personally know who he was.

*Hearing on Motion to Suppress*, at 14.

> Q. Did you ever see the Defendant before February 10th, before you
> saw those pictures [i.e., the photo line-up]?
>
> [RUDY]: No, I didn't believe I did. My brother said I have a long
> time ago, because Mr. Smith knows a couple of people that I know.

I didn't think I knew him, but my brother said I have a long time ago. I just don't remember it.

Q.  As you see him here now, do you ever remember seeing him before?

A.  Never.

*Id.,* at 59-60.

Q.  To your knowledge, had you ever seen the Defendant before you saw that [photo] array?

[RUDY]: Never.

*Trial Transcript*, at 436.

Q.  When you went down to see – on February 10th when you went down to see the photo array, did you know why you were going down to Police Headquarters?

[TRISHA]: Yes, to see his photo.

Q.  Did you know –

A.  Put him in a line-up.

Q.  Did you see the photos – did you know who you were going to see, what pictures you were going to see?

A.  No I had no idea.

*Hearing on Motion to Suppress,* at 109-110.  Further, as noted by the state appellate court, the totality of circumstances indicates that the Stefanitsises' identifications of petitioner as the perpetrator were independently reliable.  The Stefanitsises' initial identifications of petitioner took place on February 10, 2000, only eight days after the robbery.  *Id.,* at 301; 433.  Although their descriptions of the attackers varied to some extent, both Rudy and Trisha described petitioner as follows:

They stated that both individuals did have gloves when they entered the home.

\*\*\*

They stated that both the individuals had on heavy coats. They both had masks on. One individual had a scarf-type thing on that kept falling down. There was a toboggan hat, and the other individual had a hood pulled down from a large jacket drawn up to around his eyes and had the face partly covered.

*Id.*, at 280.[5] Trisha Stefanitsis told Silvernail that petitioner wore dark pants, a black toboggan hat,

---

[5] It was brought out on cross-examination of Silvernail that neither Rudy nor Trisha indicated that petitioner had a moustache or goatee, although petitioner wore both at the time of his arrest, and in the photo used in the photo line-up. *Id.*, at 344-348. However, Rudy "stated that the individual was not clean-shaven, maybe like a razor stubble or burn." *Transcript, Hearing on Motion to Suppress,* at 25; *Trial Transcript*, at 344. Further, it is possible that petitioner grew facial hair after the time of the robbery. Trisha Stefanitsis stated as follows:

Q. Did you tell the detective that the person had a moustache?

A. I don't know if I did nor not.

Q. Did the person have a mustache?

A. You know, I just looked at his nose. I didn't – I looked at his nose and his eyes. He could have had a mustache. I'm not –

Q. So you don't know whether he did or not?

A. You're right.

*Hearing on Motion to Suppress*, at 104. She indicated that the mask had not fallen low enough for her to tell whether petitioner had a goatee at the time of the robbery:

Q. Were you able to see any facial hairs on the chin?

A. I seen he had a little bit of acne right here. Either acne or razor burn. He did have something right here on his face.

Q. Okay. Did you see a goatee?

"a big goose-down coat, either brown or black," a "yarny-type" mask, "not a shawl, but it was a yarny-type and it had to be tied,"and "thick, worn leather" black gloves. *Id*., at 340-41. She said

> [t]he individual that entered the home was roughly six foot, six-foot one; 18 to 22 years old; between 160 and 180 pounds. The individual was wearing, she believed, a goose-down coat, either brown or black. He appeared medium skinned. He wasn't large built like her husband... but he was smaller. Wearing gloves, black leather. There was a mask. It was yarny type, had it tied. It kept falling down. Believed he was wearing a toboggan with a hood up over top of it. The toboggan was black. She stated dark pants and she believed the individual was wearing boots. I asked her about who she would most compare him to actor-wise. She stated Omar Epps off the Mod Squad.[6]

*Transcript, Hearing on Motion to Suppress*, at 34-35. Rudy Stefanitsis said petitioner wore a green Army jacket, and a brown bandana. *Id*., at 344. Rudy stated that the entire incident occurred over a period of twelve to fifteen minutes. *Id.*, at 397. Petitioner's mask fell down four to five times, during which time Rudy and Trisha were able to see his entire face. *Id*., at 398-99; 428; 499. Rudy was confident of his identification of petitioner.

A. Oh, he's definitely the second [man who entered the home]....

***

---

A. No, because when it fell down, it fell down to right here. So if I was going to see anything, the only thing I saw was right here. And that's what I remembered, this and the shape of his nose and his eyes.

*Id*., at 106.

[6] Petitioner argues that "the round, pudgy Omar Epps bears no resemblance to Mr. Smith, who is tall and lean." *See Petition*. However, neither a photograph of Omar Epps, nor petitioner's photo have been made a part of the record here, and petitioner's assertion is therefore unsupported by the record before this Court.

A. Oh, I'm 100 percent sure.

*Id.*, at 401-02.

A. ... I'm 150 percent sure he's the one that came in my home.

Q. Are you more certain now that you've seen him live –

A. Oh, definitely.

*Transcript, Hearing on Motion to Suppress*, at 57.

Q. Do you feel the stress of the situation made you pay less attention

or more attention?

A. More attention.

Q. Why?

A. Because I wanted to make sure that – I mean, I couldn't figure out the whole time why it was happening to me, why it was happening to me. And then I want to make sure who it was, if I could identify them, see if I knew them. And that made me pay attention to his face when the rag kept falling off.

*Id.*, at 432. The gunmen were in close proximity to the victims and, contrary to petitioner's

allegation, the record does not indicate that the lighting was inadequate:

Q. Well, during the crime, how close were you to him?

[RUDY STEFANITSIS]: Sometimes just as close as right here to here...

Q. So you're pointing to the microphone?

A. Yes, sir.

***

Q. How is the lighting at your house?
A. In the basement, I have two lights over the pool table. I have a main light that you can switch on, and then I also had that light that

I plugged in.  It's light..

*Id*., at 437.

Q.  How was the lighting when the mask would fall?...

[TRISHA STEFANITSIS]: It was in the basement.  It was the regular basement lights.  It wasn't bright.  I mean, it was like a perfect lighting for a basement.

*Id*., at 500.

[RUDY]:  .. I'm picking him out because he came to my house.

\*\*\*

Q.   Are you sure?

A.  Yes, sir.

Q.   Are your firmly convinced that the Defendant is the man that broke – one of the men that broke into your house?

A.  I know it and he knows it.

Q.  How can you be so certain?

A.  I'm just looking right at him and it's him.

\*\*\*

Q.  Are you completely certain?

A.  100 percent.

*Id*., at 444-46.

[TRISHA]: From day one, I knew as soon as I left there I knew exactly what he looked like.  I could see his face every day in my head.  From February 2nd, I've seen his face every single day.  I remember his face ten times a day.  I remember it all the time.  I remember the situation every single day.  I have nightmares about it. I have everything about it.  And I remember – there's no doubt in my mind about it.  I'm not – I remember his face.

        ***

    A. ... It's him.

    Q.  How do you know?

    A.  Because I know it's him, because that's the face I see all the time.

*Id.*, at 501-02.

> [TRISHA]: I already knew that this was the person that I picked, but for my conscience – and I already knew 150 percent this is the person, but for me, I wanted to make sure before anyone goes and gets this person on this paper, that this is the right person.  So for me, I asked [Silvernail] if there was any way that he could put a little hat on this person, maybe a mask so I could see.  And he had done that for me.  And then – I mean, I already knew, but that just made me feel better....

*Id.*, at 508.

> [TRISHA]: Well, I already knew in the pictures that it was [him], but seeing him physically, all the emotions that went through my body was more worse than seeing the pictures.  So seeing him, I could identify him a lot more.  Well, I mean, I already knew it was him.  I mean, the pictures are perfect pictures.  But as soon as I saw him, it was more real to me.

*Id.*, at 511.  Silvernail attempted to create a composite drawing based on Trisha's description of

petitioner, but was unable to do so:

> Q.   You discussed Mrs. Stefanitsis not being happy with the composite.
>
> A.  That's correct.
>
> Q.  What did she tell you?
>
> A. When we attempted to do this for an hour, she was not happy with the composite at all.  I just couldn't get the features correct for the way she wanted them.

*Id.*, at 363.

Based upon all of the foregoing, and for the reasons discussed by the state appellate court, the Magistrate Judge concludes that petitioner's claim is without merit and **RECOMMENDS** that this action be **DISMISSED**.

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

<u>March 19, 2004</u>                                    <u>    *s/Norah McCann King*    </u>
                                                                  Norah McCann King
                                                                  United States Magistrate Judge